* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Ledford and the briefs and arguments before the Full Commission. The appealing parties have not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. The Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * * *Page 2 
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. On September 14, 2004, the admitted date of injury, an employment relationship existed between plaintiff and defendant-employer.
3. Defendant-employer was a participant in a self-insured fund administered by Berkley Insurance Company.
4. The claim filed by plaintiff George W. Davis (hereafter "plaintiff") is for an injury by accident arising out of and in the course of his employment with defendant-employer, which occurred on September 14, 2004, causing injury to his head, back, left and right upper and lower extremities. Defendant denied compensability of the claim.
5. Plaintiff's average weekly wage is disputed. Plaintiff contends he had an average weekly wage of $350.00, with a compensation rate of $233.35. Defendant submitted a Form 22 reflecting an average weekly wage of $228.48, with a compensation rate of $152.33. Defendant subsequently submitted a Form 22 of a similarly situated newly hired truck driver and a Form 22 of a similarly situated pilot truck driver, since plaintiff had only worked for defendant-employer for a short time prior to the date of injury.
6. After the Deputy Commissioner's hearing, plaintiff's counsel submitted the following documents, which were stipulated into evidence before the Deputy Commissioner:
 a. Plaintiff's Medical Records
 b. Industrial Commission Forms *Page 3 
 c. Plaintiff's Answers to Defendant's Interrogatories
 d. Defendant's Answers to Plaintiff's Interrogatories
 e. Investigation Report, Photographs
7. The issues before the Full Commission are whether plaintiff sustained a compensable injury by accident arising out of and in the course of his employment on September 14, 2004; and, if so, what benefits, if any, plaintiff is entitled to receive.
 * * * * * * * * * * * EVIDENTIARY RULING
At the Deputy Commissioner's hearing, defendant presented evidence that a woman was driving a vehicle behind plaintiff and that she saw his truck veer off the road. The unidentified woman allegedly told Early Booe, the job foreman, that plaintiff's truck veered off the road and that plaintiff slumped over before his vehicle left the roadway. The Form 19 filed by defendant on September 17, 2004 states, in part, "The driver of the car following Mr. Davis reported seeing Mr. Davis slump over in the truck." Plaintiff contends this is a hearsay statement that is inadmissible under any exception to the hearsay rules. Defendant contends that the statement falls under the present sense impression exception to the hearsay rules. Although the woman could not be identified or located to testify at the Deputy Commissioner's hearing, her statements were received into evidence by the Deputy Commissioner as a present sense impression exception to the hearsay rule.
Pursuant to Rule 804(b) of the North Carolina Rules of Evidence, the Full Commission finds that the statement made by the unidentified woman is inadmissible hearsay. Defendant was not able to locate or confirm the identity or existence of the unidentified woman. In addition, the statement lacks any indicia of the equivalent circumstances of trustworthiness and is inherently *Page 4 
unreliable. Thus, the Commission finds that the statement made by the unidentified woman was not admissible and the ruling by the Deputy Commission is hereby reversed. The statement shall not be admitted into evidence.
 * * * * * * * * * * *
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is 52 years of age, with a date of birth of November 7, 1954. He has been married to Ivy Davis for 15 years. By order of the Executive Secretary filed October 19, 2004, Mrs. Davis was appointed plaintiff's guardian ad litem for purposes of this claim.
2. In August 2004, plaintiff began working as a truck driver for defendant-employer, who is in the paving business. Due to a shortage of available truck driving work, plaintiff began working as a pilot truck driver for defendant-employer. As a pilot truck driver, plaintiff guided traffic on a one-lane, one-way road through a paving site. The pilot truck travels no more than 25 miles per hour, guides traffic one-way, and returns.
3. On September 14, 2004, plaintiff had been employed and earned wages with defendant-employer for 14 days, earning a total of $848.52. This would yield an average weekly wage of $424.26. Forms 22 submitted by defendant-employer for "like and similar employees" totaled gross wages of $23,874.36 for one employee and $22,768.65 for a second employee. These would yield average weekly wages of $459.12 and $437.86, respectively. Using an average of the wages of the two similar employees, plaintiff's average weekly wage was $448.49, which yields a compensation rate of $299.00 per week. *Page 5 
4. On September 14, 2004, plaintiff was involved in a one-car motor vehicle accident, which occurred while plaintiff was performing his duties as defendant-employer's pilot truck driver at a paving site in Greenville, South Carolina. The work zone covered about eight-tenths of a mile and went around a curve.
5. Immediately before the accident on September 14, 2004, plaintiff drove co-worker Jimmy Renegar in the pilot truck to a location on the job site where Mr. Renegar would be the flagman. Mr. Renegar testified that while in the truck, he conversed with plaintiff and plaintiff seemed fine. To Mr. Renegar's knowledge, there was nothing mechanically wrong with the truck plaintiff was driving. Plaintiff dropped Mr. Renegar off and drove about 300 yards down the road. Mr. Renegar did not witness the accident because it happened in the curve and out of his line of sight.
6. Plaintiff's accident occurred on a dry road during daylight hours. After dropping off Mr. Renegar, plaintiff was leading traffic through the work zone, driving the pilot truck at approximately 25 miles per hour, heading southbound on Bates Bridge Road in Greenville, South Carolina. In an area where the road curved to the right, plaintiff's pilot truck continued traveling straight ahead, went off the road, and rolled down a 15 foot embankment.
7. Photographs of the accident scene show no skid marks or evidence that plaintiff tried to stop the vehicle before it traveled off the road. Testimony of the witnesses who arrived at the scene after the accident confirms that no skid marks or other evidence of an attempt to stop the truck was present. As a result of the accident, plaintiff's truck sustained damage primarily to the driver's side and hood.
8. Upon learning of the accident, Early Booe, the job foreman, immediately got into a pickup truck and drove to the area, got out and went down the bank to check on plaintiff. Mr. Booe *Page 6 
also called the shop to report the accident. Mr. Booe found two men on the scene who were not employed by defendant-employer, but who had pulled plaintiff from the pickup truck. 9. The air bag of plaintiff's pilot truck had deployed and there was minor evidence of blood on the air bag. There was no blood found on the driver's side, but there was blood found on the passenger side of the truck. Plaintiff had a 7-centimeter laceration over his right eye. Plaintiff did not lose consciousness, but became combative with EMS personnel when they arrived at the scene and attended to him.
10. After being assessed by the EMS personnel, plaintiff was airlifted by Med-Trans helicopter EMS and transported to Greenville Memorial Hospital in Greenville, South Carolina. The assessment notes indicated that he had no memory of the crash and had loss of consciousness. It was noted that plaintiff was awake but gave inappropriate answers to questions.
11. Plaintiff was treated by trauma specialist Dr. Joseph A. Camunas, who diagnosed subarachnoid hemorrhage, intraventricular hemorrhage, and intraparenchymal hemorrhage. According to Dr. Camunas, plaintiff's medical records reveal a social history of heavy alcohol consumption, along with a history of hypertension, diabetes, and tobacco use. Dr. Camunas admitted plaintiff to the intensive care unit and placed him on a delirium tremors protocol for possible alcohol withdrawal, based upon his history.
12. From September 14, 2004 through September 30, 2004, plaintiff received treatment from the Greenville Hospital System. September 22, 2004 medical notes reflect that plaintiff abused alcohol and drank a fifth of moonshine per day. On September 30, 2004, plaintiff was transferred to Wake Forest University Baptist Medical Center to be closer to his home. Plaintiff was treated by Dr. Jason Hoth, a trauma critical care physician. Plaintiff's *Page 7 
records from this hospitalization also indicate a premorbid use of alcohol and Dr. Hoth found plaintiff's response to questions to be incomprehensible, presumably due to his head injury. Plaintiff experienced one seizure during his hospital stay, which the neurologist thought was secondary to the closed head injury. At his deposition, Dr. Hoth testified that despite plaintiff's risk factors for spontaneous hemorrhage, he had no reason to doubt the previous diagnosis of traumatic hemorrhage.
13. On October 21, 2004, plaintiff was transferred to the J. Paul Sticht Center of Wake Forest University Baptist Medical Center for physical and cognitive rehabilitation. Dr. George Wittenberg, a neurologist in the Acute Care Program, conducted an examination of plaintiff. Dr. Wittenberg noted that plaintiff had "a history of alcohol abuse and severe closed head injury." Plaintiff appeared to be having hallucinations, answering questions not asked, and acting as if there were other people in the room. Although plaintiff's memory had improved, Dr. Wittenberg found plaintiff's answers to questions "unreliable" and that plaintiff had a significant amount of "altered sensorium." Dr. Wittenberg did not rely upon what plaintiff told him, but relied upon his own examination and the other medical history.
14. Dr. Wittenberg believed that plaintiff's single seizure was probably related to a closed head injury from the accident. Hallucinations are a symptom of alcohol withdrawal and, considering plaintiff's history of alcohol use, Dr. Wittenberg also noted that "it is possible that he is continuing to go through alcohol withdrawal." However, Dr. Wittenberg testified that given the time that had elapsed between initial hospitalization and his exam, alcohol withdrawal was fairly unlikely.
15. Dr. Wittenberg diagnosed plaintiff with subarachnoid hemorrhage, intraventricular hemorrhage, and intraparenchymal hemorrhage. Dr. Wittenberg testified that the *Page 8 
main causes of subarachnoid hemorrhages are trauma and ruptured aneurysm and the main risk factor for the development of a spontaneous subarachnoid hemorrhage is elevated blood pressure. Other risk factors are inflammation and infection, smoking, kidney disease, fibromuscular dysplasia, and increased age. Alcohol abuse is a risk factor for intraparenchymal hemorrhage. Plaintiff exhibited at least three risk factors for spontaneous subarachnoid hemorrhage, as well as alcohol abuse, a risk factor for intraparenchymal hemorrhage. Plaintiff was approaching the age of 50, had hypertension, was a binge drinker and alcohol abuser, and smoked cigarettes.
16. On November 19, 2004, plaintiff was discharged from the Sticht Center. Plaintiff continued to undergo outpatient neurorehabilitation treatment.
17. From December 15 until December 17, 2004, plaintiff was admitted to the Neurology Department of Baptist Medical Center for seizure activity. Dr. Jason Greenberg assessed plaintiff with seizures, possibly post-traumatic in nature. Plaintiff continued to experience seizures in March and May of 2005. A May 21, 2005 CT scan revealed that plaintiff exhibited mild atrophy and mild cardiomegaly.
18. On January 3, 2005, Dr. Greenberg noted that plaintiff had several problems with his movements that were similar to Parkinson's disease. According to Dr. Greenberg, these symptoms are not uncommon in people who have had moderate or severe head injuries. Dr. Greenberg also observed plaintiff's continued behavioral issues, including outbursts, which Dr. Greenberg noted were also common with brain injuries. In attempting to speak to plaintiff, Dr. Greenberg had to rely on plaintiff's wife to provide important information and noted that even if he had been able to obtain information from plaintiff, he would have been skeptical as to the value of the information. *Page 9 
19. Dr. Greenberg testified that it is "fairly unlikely" that plaintiff had a brain hemorrhage as the first precipitating event and that it would be more likely that plaintiff had a seizure that caused him to lose control of his vehicle. Dr. Greenberg stated that plaintiff suffered traumatic injury to his brain as a consequence of the vehicular accident. Dr. Greenberg has attributed most of plaintiff's problems assessed at the January 2005 visit to post-traumatic Parkinsonism.
20. An MRI of plaintiff's brain performed in March 2005 showed no aneurysm. Dr. Wittenberg's opinion is that plaintiff did not have an aneurysm prior to his accident, but more likely suffered a subarachnoid hemorrhage as a "spontaneous first event" which caused the vehicular accident. Dr. Wittenberg also testified that plaintiff suffered additional bleeding in his brain as a result of his head trauma from the accident.
21. Dr. Charles Kanos is a neurosurgeon with Southeastern Neurosurgical Institute and treated plaintiff on September 14, 2004, at Greenville Hospital. Dr. Kanos testified that plaintiff experienced a traumatic subarachnoid hemorrhage, as opposed to a spontaneous subarachnoid hemorrhage, in part based upon an erroneous history that plaintiff was ejected from his motor vehicle during the accident. However, Dr. Kanos testified that even if plaintiff was not ejected from the vehicle, it did not change his opinion, as most people that have a severe head injury are not ejected. Dr. Kanos acknowledged in his deposition testimony that it is possible that plaintiff had a seizure or some other event that caused him to veer off the road. However, he did not believe the seizure caused the subarachnoid hemorrhage. In Dr. Kanos' opinion, the subarachnoid blood was more likely from trauma sustained in the accident rather than a spontaneous hemorrhage. *Page 10 
22. Dr. Joseph Camunas, a general surgeon with the Greenville Hospital system, treated plaintiff on the date of the accident and in follow-up during his stay at the hospital. In his deposition testimony, Dr. Camunas acknowledged that plaintiff was in the high-risk group for spontaneous subarachnoid hemorrhage. He testified that it was "possible" that plaintiff experienced a spontaneous subarachnoid hemorrhage, prior to and which caused the accident on September 14, 2004. However, Dr. Camunas did not hold this opinion to a reasonable degree of medical certainty.
23. Based upon the greater weight of the medical evidence, the Commission finds that plaintiff suffered a seizure or other precipitating event that caused the accident on September 14, 2004. As a consequence of the accident, plaintiff sustained trauma to his head and a closed head injury, as well as injury to his back, left and right upper and lower extremities. His injuries resulted in bleeding in his brain, subacrahnoid hemorrhage, intraventricular hemorrhage, and intraparenchymal hemorrhage. Plaintiff has developed cognitive and behavioral problems due to his closed head injury.
24. Dr. Greenberg testified and the Commission finds that plaintiff has four significant ongoing issues caused by the accident, including urinary incontinence, seizures, bodily movements, and behavior problems. Dr. Greenberg felt that plaintiff should not be placed in stressful situations because of his behavior problems and because people with brain injuries usually tend to be quick to anger, more aggressive and violent. Dr. Greenberg does not think that plaintiff will be able to take care of himself and will probably need continuous supervision and assistance.
25. Plaintiff has been re-admitted to Baptist Medical Center and Hugh Chatham Hospital in Elkin, North Carolina, on several additional occasions for complications from post-traumatic *Page 11 
seizure disorder secondary to the closed head injury he suffered as a result of his motor vehicle accident.
26. Plaintiff's wife of 15 years, Ivy Davis, continues to care for plaintiff on a daily basis. Plaintiff does not have a nurse's aide or any other home health care attendant. Mrs. Davis assists plaintiff with his bath, changes the diapers that he wears due to his incontinence, and helps him get dressed. Prior to the vehicular accident, plaintiff was able to perform such daily activities without requiring any assistance.
27. Mrs. Davis testified that since the accident, plaintiff needs assistance walking and has problems with balance. He can ride in the truck with her to the store, but stays in the truck while she goes inside. Since the accident, plaintiff cannot remember things and has difficulty speaking clearly at times. Although plaintiff was present at the Deputy Commissioner's hearing, he did not testify and has no recollection of the events at issue. Plaintiff is left-handed and sometimes has problems eating using his left hand. Plaintiff's personality has changed and he is easily agitated. Mrs. Davis can only leave plaintiff with his brother or sister.
28. On September 14, 2004, plaintiff was acting in the course of his employment and performing his job duties for defendant-employer when the truck he was driving went down a 15-foot embankment causing injuries to his head, back, left and right upper and lower extremities.
29. The Commission finds that plaintiff needs ongoing medical treatment for his injuries, including urinary incontinence and the consequences of his closed head injury.
29. As a result of his injuries, plaintiff has been physically, mentally, and emotionally impaired since the accident. Due to the nature and extent of his injuries, plaintiff has been unable to earn wages in the same or any other employment since September 14, 2004. *Page 12 
30. Defendants have not prosecuted this action without reasonable grounds.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. In order for an injury to be compensable under the Workers' Compensation Act, it must be the result of an accident arising out of and in the course of employment. N.C. Gen. Stat. § 97-2(6). In this case, plaintiff sustained an injury by accident when his truck ran off the road and down an embankment. There is no dispute that the accident occurred during working hours and while plaintiff was engaged in the performance of his duties. See, Taylor v. Twin City Club, 260 N.C. 435,132 S.E.2d 865 (1963).
2. Where an idiopathic condition is the sole cause of an injury, the injury does not arise out of an accident; however, if an idiopathic condition combines with risks attributable to the employment to cause the injury, then the injury does arise out of the employment. Mills v.City of New Bern, 122 N.C. App. 283, 468 S.E.2d 587 (1996).
3. In the case at bar, even if plaintiff suffered a stroke, seizure or other neurological event prior to and which led to the accident, the nature of his work put him at an increased risk of a vehicular accident. The injury arose out of the employment in that the nature of plaintiff's employment was a contributing proximate cause of his injury and one to which plaintiff would not have been equally exposed if he had not been so employed. Roberts v. Burlington Indus., Inc., 321 N.C. 350, 364 S.E.2d 417
(1988); Rose v. City of Rocky Mount, ___ N.C. App. ___, 637 S.E.2d 251
(2006), disc. review denied, 361 N.C. 356, 644 S.E.2d 232 (2007). At the time of the idiopathic event that led to the accident, plaintiff's vehicle was still moving and plaintiff was not *Page 13 
in a place of safety but was subject to the particular hazards of riding in a vehicle that was traveling around a curve near a steep embankment. The accident would not have occurred but for the hazards inherent in plaintiff's working conditions with defendant-employer. See, Allred v.Allred-Gardner, Inc., 253 N.C. 554, 117 S.E.2d 476 (1960); Rose v. Cityof Rocky Mount, supra; Ramsey v. Southern Indus. Constructors, Inc.,178 N.C. App. 25, 630 S.E.2d 681, disc. review denied, 361 N.C. 168,639 S.E.2d 652 (2006). Therefore, plaintiff sustained a compensable injury by accident arising out of and in the course of his employment with defendant-employer on September 14, 2004. N.C. Gen. Stat. § 97-2(6).
3. Plaintiff is entitled to all medical expenses incurred or to be incurred as a result of his compensable injury, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability. N.C. Gen. Stat. §§ 97-2(19); 97-25.
4. Based upon the wages of the two similarly situated employees, which is the most appropriate method of calculating plaintiff's average weekly wage, plaintiff `s average weekly wage was $448.49, which yields a compensation rate of $299.00 per week. N.C. Gen. Stat. § 97-2(5).
5. As the result of his compensable accident of September 14, 2004, plaintiff is disabled and unable to earn wages in the same or any other employment and is entitled to payment by defendant of total disability compensation at the rate of $299.00 per week beginning September 14, 2004 and continuing until further Order of the Commission. N.C. Gen. Stat. § 97-29.
6. Because this matter was appealed by both parties, plaintiff is not entitled to an award of attorney's fees pursuant to N.C. Gen. Stat. § 97-88. *Page 14 
7. Defendant did not defend this action without reasonable grounds and, therefore, plaintiff is not entitled to attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1. Sparks v. Mountain Breeze Restaurant,55 N.C. App. 663, 286 S.E.2d 575 (1982).
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney's fee below, defendant shall pay plaintiff total disability compensation at the rate of $299.00 per week beginning September 14, 2004 and continuing until further order of the Commission. Any accrued compensation shall be paid in a lump sum.
2. Defendant shall pay all medical expenses incurred or to be incurred by plaintiff as a result of his compensable injury by accident so long as the medical treatment tends to effect a cure or give relief or lessen plaintiff's disability, including ongoing medical treatment for his closed head injury and urinary incontinence.
3. A reasonable attorney's fee of 25% of the compensation due plaintiff is approved for plaintiff's attorney. Twenty-five percent of the lump sum due plaintiff shall be paid directly to plaintiff's counsel. Thereafter, every fourth check of ongoing compensation due plaintiff shall be paid directly to his attorney.
4. Defendant shall pay the costs.
This 5th day of September, 2007.
 S/______________________
 LAURA KRANIFELD MAVRETIC
COMMISSIONER *Page 15 
CONCURRING: S/______________________ BUCK LATTIMORE CHAIRMAN
S/______________________ DIANNE C. SELLERS COMMISSIONER *Page 1